# United States Court of Appeals
## For the First Circuit

No. 99-1357

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ RAMÓN HERNÁNDEZ,

Defendant, Appellant.

No. 99-1358

UNITED STATES OF AMERICA,

Appellee,

v.

DOUGLAS GORBEA DEL-VALLE,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lipez, Circuit Judge.

———————————

Francisco M. Dolz-Sánchez for appellant Hernández.

David W. Roman, with whom Brown & Ubarri was on brief, for appellant Gorbea Del-Valle.

Nelson Pérez-Sosa, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Jorge E. Vega-Pacheco, Assistant United States Attorney, were on brief, for appellee.

———————————

July 17, 2000

———————————

**LYNCH,** <u>Circuit Judge</u>.  In September of 1997, U.S. Customs agents intercepted a container holding cocaine bricks with a street value of close to one billion dollars.  The cocaine was amidst cartons of plastic cups.  A jury convicted José Ramón Hernández and Douglas Gorbea Del-Valle of various federal offenses associated with a conspiracy to import, possess, and distribute this cocaine.  Gorbea claimed to be the owner of the container; Hernández and his company transported the container in Puerto Rico.  Hernández was given concurrent sentences of 293 months on each of five counts, and Gorbea was given concurrent sentences of 292 months on each of four counts.  Both defendants appeal, alleging numerous errors.  We affirm.

## I.

We briefly sketch the facts here, saving the details for the analysis of the defendants' claims.

On September 27, 1997, U.S. Customs officials received information that a particular container, which was expected to arrive at the Crowley Yard in San Juan, Puerto Rico, contained contraband.  The container had been shipped by sea from Venezuela.  Customs

officials located the container the next day, placed an electronic hold on it, and moved it to Customs facilities in Cataño for inspection. The bill of lading indicated that the container held disposable plastic cups, that the consignee was a supermarket, and that the consignee's representative was South Atlantic Trading Company (SATCO). Defendant Gorbea was one of the owners of SATCO and ran its business. He was listed as the person to be notified of the container's arrival. On unloading the container, Customs agents discovered that some of the boxes of plastic cups contained bricks of cocaine. All in all, the agents removed 7,514 pounds (a gross weight of approximately 3,415 kilograms) of cocaine from the container. Approximately 141 of the 830 boxes in the container contained cocaine.

The Customs agents repacked the container, leaving approximately 24 pounds (10 kilograms) of cocaine in it. The agents installed electronic equipment that allowed them to track the container's location and to determine whether it had been opened. The container was returned to the Crowley Yard, where it was placed under 24-hour surveillance.

On September 29, defendant Gorbea called the Customs office, identified himself as the owner of the container, and asked why the container had been taken to Cataño for inspection. He was told that there was no problem with the container and that he could pick it up later that day. Around October 1, Gorbea went to the customs broker

-4-

and arranged for payment of the freight charges associated with the container. An employee of the customs broker said that Gorbea was in a hurry to receive this shipment. In fact, Gorbea had instructed his secretary to call the customs broker several times to "see what the status [of this shipment] was and to hasten them."

The customs broker completed the necessary paperwork by the next day, October 2. That day, two employees of J.R. Transport, a company owned by defendant Hernández, arrived at Crowley Yard to pick up the container. The driver, Alain Ruiz-Galíndez,[1] retrieved the container and drove it out of Crowley Yard.

The truck stopped several times during its route, sometimes remaining stopped for half an hour or more. A trip that the district court judge estimated would normally take about half an hour to make took about four hours. At times when some of the other cars on the road had their headlights on, the truck drove without its headlights.

Hernández followed the truck in a gray van from the time it left Crowley Yard. During one of the stopovers, Hernández emerged from the gray van and got into the truck with Ruiz-Galíndez. Hernández remained in the truck for the duration of its trip and, at some point, the gray van stopped following the truck. Eventually, the truck arrived

---

[1] Ruiz-Galíndez was acquitted at trial. Edward Maldonado-Baez, the employee who signed the bill of lading and who directed Ruiz-Galíndez to retrieve the container, entered into a plea agreement with the government prior to trial.

at J.R. Transport's truck yard.  One of the officers following the truck reported that a number of people in a Crown Victoria arrived at J.R. Transport around the same time.  He reported that one of the passengers in the Crown Victoria appeared to be giving orders and that one of the passengers was holding a "dark, black long object."  The individuals in the truck yard greeted and congratulated one another once the container was moved into the lot.

After watching the people and cars coming and going into the truck yard, the officers moved in.  Arrests were made and the container was seized.  It had not been opened.

Gorbea was arrested in December.  At the time of his arrest, a document was found in his briefcase.  It was a fax dated February 5, 1997, from a Marina Kassert in Venezuela to Gorbea regarding an earlier shipment of plastic cups.  It said, "I urgently need the information of your friend that has the truck to square everything with him."  On the back of the fax, Gorbea had written the name José Hernández.

At the time of the cocaine shipment, Gorbea's company was primarily in the business of importing crackers.  Another trucker was used for transporting the shipments of crackers.  Although this trucker hauled some shipments of plastic cups, the evidence suggests that Hernández's trucking company was used only for plastic cup shipments.

**II.**

The jury found the defendants guilty of all charges.[2] On appeal, Gorbea challenges the district court's denial of his motion for judgment of acquittal, arguing that the government failed "to prove beyond a reasonable doubt that [he] knew he was importing cocaine," an essential element "for any of the violations of federal law charged in the indictment." Gorbea also argues that the prosecutor made improper comments during closing arguments that denied him a fair trial.

Hernández challenges the denial of his motion for judgment of acquittal, saying that there was insufficient evidence of his knowledge of the scheme and his voluntary participation in it to support his convictions. Hernández also argues that the district court erred in allowing testimony as to the street value of the seized cocaine, that he should not have been held responsible for the entire quantity of cocaine seized, and that he should have been sentenced to a minimum term of imprisonment of 120 months.

---

[2] Hernández was charged with five counts: conspiracy to possess with intent to distribute approximately 3,017 kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One); aiding and abetting in the attempt to possess with intent to distribute approximately 3,017 kilograms of cocaine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 (Count Two); aiding and abetting in the possession with intent to distribute approximately 10 kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Three); conspiracy to import approximately 3,017 kilograms of cocaine into the United States in violation of 21 U.S.C. §§ 952(a) and 963 (Count Four); and aiding and abetting in the importation of cocaine into the United States in violation of 21 U.S.C. 952(a) and 18 U.S.C. § 2 (Count Five). Gorbea was charged with Counts One, Two, Four, and Five.

We review each of the defendants' claims in turn.

A. Denial of the Motions for Judgment of Acquittal.

At trial, Gorbea and Hernández opted not to present any evidence in their defense and moved, at the close of the government's case, for a judgment of acquittal under Federal Rule of Criminal Procedure 29.[3] Before the district court, Gorbea argued that "the element of knowledge is not present in the case and the United States has failed to prove at any time the element of possession." Hernández's primary argument to the district court was that there was insufficient proof of "any agreement between him or any other of the defendants to posses[s] with intent to distribute cocaine or to posses[s] or to attempt to import into the United States the cocaine."

Viewing the evidence in the light most favorable to the government, the district court denied the motions. The district court pointed to the "abundance of evidence presented by the government." In particular, the district court relied on evidence that (1) the bill of lading listed a supermarket as the consignee, even though that supermarket had never purchased plastic cups from SATCO; (2) there was a change in the trucking company used and in SATCO's standard operating

---

[3]    Because the defendants did not present any evidence in their defense, it was not necessary for them to renew their motions to preserve review of the sufficiency of the evidence issue. See United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995); United States v. Cheung, 836 F.2d 729, 730 n.1 (1st Cir. 1988).

procedures for plastic cup shipments; (3) although SATCO was in financial trouble, it was selling plastic cups at a loss; (4) shipments of plastic cups often were not delivered to SATCO until a delay of one or two days after they were picked up at the dock; (5) Ruiz-Galíndez, the driver, gave an untrue account of his activities when he was interrogated by the police on the day of the surveillance; (6) Ruiz-Galíndez and Hernández gave the container their "undivided attention" and took four hours to drive the container from Crowley Yard to their destination, a distance that normally would not take "more than half an hour" to drive; (7) there were "concerns about the load," as evidenced by the arrival of the individuals in the Crown Victoria and "what appeared to [a law enforcement officer] to be a weapon"; (8) around the time that the shipments of plastic cups began, Gorbea had begun using the nickname "Wallace" and receiving phone calls, which he would only take in private, from someone who identified himself as "Wallace"; and (9) when one of the earlier containers of plastic cups had arrived at SATCO with half of the boxes missing and with some of the boxes opened and scattered in the trailer, Gorbea had told his secretary he "already knew it" and that it "didn't matter." On appeal, both Gorbea and Hernández challenge the district court's denial of their motions for judgment of acquittal.[4]

_____

[4] "[C]hallenges to the sufficiency of the evidence and to the denial of the motion for judgment of acquittal raise a single issue" and thus we apply the traditional sufficiency of the evidence standard

Defendants challenging convictions for insufficiency of evidence face an uphill battle on appeal. We review de novo the district court's Rule 29 determinations. See United States v. Hernandez, 146 F.3d 30, 32 (1st Cir. 1998). However, "[o]ur review of the district court's decision to deny a motion for acquittal is quite limited; we must affirm unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt." United States v. Paradis, 802 F.2d 553, 559 (1st Cir. 1986); see United States v. Loder, 23 F.3d 586, 589 (1st Cir. 1994) (referring to the "formidable standard of review" applicable to such cases). "[T]he government need not present evidence that precludes every reasonable hypothesis inconsistent with guilt in order to sustain a conviction." Loder, 23 F.3d at 590. Rather, "the total evidence, with all reasonable inferences made in the light most favorable to the government, must be such that a rational trier of fact could have found guilt beyond a reasonable doubt." Id. In applying this standard, "no premium is placed upon direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." United States v. Ortiz, 966

to these claims. United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998) (internal quotation marks and citation omitted); see United States v. Loder, 23 F.3d 586, 590 (1st Cir. 1994) ("[T]his court reviews a district court's denial of a defendant's motion for a judgment of acquittal using the identical standard employed to measure the sufficiency of the evidence supporting a guilty verdict.") (internal quotation marks and citation omitted).

-10-

F.2d 707, 711 (1st Cir. 1992). And in conducting its review, this court cannot weigh the evidence or make credibility judgments; these tasks are solely within the jury's province. See id. The court must reject only "those evidentiary interpretations . . . that are unreasonable, insupportable, or overly speculative," United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995), and must uphold any verdict that is "supported by a plausible rendition of the record," Ortiz, 966 F.2d at 711.

The defendants challenge the sufficiency of the evidence as to both their conspiracy and aiding and abetting convictions. To prove conspiracy, the government must show "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." United States v. Gomez-Pabon, 911 F.2d 847, 852 (1st Cir. 1990). To establish that the defendants belonged to and participated in the drug conspiracy, the government must show two kinds of intent: "intent to agree and intent to commit the substantive offense." Id. at 853 (internal quotation marks and citation omitted). Aiding and abetting requires the government to show that a defendant "participated in the venture and sought by [his] actions to make it succeed." United States v. Guerrero, 114 F.3d 332, 341 (1st Cir. 1997) (internal quotation marks and citation omitted). This burden is fulfilled by "a showing that the defendant consciously shared the principal's knowledge of the

-11-

underlying criminal act, and intended to help the principal." Spinney, 65 F.3d at 235. Knowledge of the particular controlled substance being imported or distributed is not necessary, see United States v. Kairouz, 751 F.2d 467, 468-69 (1st Cir. 1985); cf. Gomez-Pabon, 911 F.2d at 853, and intent to distribute can be inferred from the quantity of drugs involved, see United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993).

1.  Gorbea

At bottom, Gorbea's argument is, as to both the conspiracy and the aiding and abetting convictions, that the government failed to prove intent because it offered insufficient proof that he had knowledge of the criminal scheme and made a conscious decision to participate in it and further its objectives.

A reasonable jury could have found Gorbea guilty of the crimes charged beyond a reasonable doubt. A great deal of circumstantial evidence linked Gorbea to the scheme and indicated his knowledge of the scheme's contours. Shipments of plastic cups were handled differently than were shipments of other items imported by SATCO. Gorbea's involvement in these shipments was more extensive than was his involvement in the shipments of crackers -- SATCO's primary business line. Unusually, Gorbea insisted on taking calls in private from a person identifying himself as "Wallace" around the time SATCO began importing plastic cups. SATCO imported the cups even though it

-12-

lost money on them. Hernández's employees, rather than the normal trucking company used for shipments of crackers, were sometimes used to retrieve and deliver the plastic cups. At least one shipment of cups had arrived at SATCO in a state that suggested that the boxes had been opened and something removed prior to delivery to SATCO. When Gorbea's secretary brought this fact to his attention, Gorbea said that he "already knew it" and that it "didn't matter." Gorbea showed concern about the shipment of plastic cups involved in this case: he instructed his secretary to call the customs broker to hurry things up, and he himself called the customs office to ask why the container had been taken off-site on a Sunday for inspection. Quite compelling is the fact that the consignee listed on the bill of lading had never purchased plastic cups from SATCO and had no intention of purchasing any of the cups in the container. Indeed, Gorbea described himself as the owner of the container. This evidence, together with the fact that the previous shipments of cups had been sold at a loss, readily supports the rational conclusion that the shipments of cups were merely a vehicle and a subterfuge for the larger criminal scheme.

Gorbea, quoting United States v. DeLutis, 722 F.2d 902, 906 (1st Cir. 1983), dismisses this evidence as "the piling of 'unfounded and unsupported inferences on top of each other.'" His argument ignores the fact that "[c]hains of inference are a familiar, widely accepted ingredient" of any process of reasoning and that they are

-13-

"regularly relied upon in the realm of human endeavor, and should not be forbidden to a criminal jury." Spinney, 65 F.3d at 238. Juries "take full advantage of their collective experience and common sense" in evaluating the evidence presented to them at trial and reaching a verdict. Id. at 237 (internal quotation marks and citation omitted). That these inferences are based on circumstantial evidence is of no import. Intent can be proven "wholly on the basis of circumstantial evidence." United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995); see Spinney, 65 F.3d at 234 ("Reliance on indirect, as opposed to direct, evidence in a criminal case is both permissible and commonplace."). Given the nature of the crime, "[k]nowledge and intent in narcotics cases often must be proved largely by circumstantial evidence." United States v. Valencia, 907 F.2d 671, 678 (7th Cir. 1990).

There is sufficient evidence in the record to support the conclusion that Gorbea knew of and actively participated in the scheme to import and distribute cocaine. A container carrying a large amount of cocaine was shipped to Puerto Rico, and Gorbea was listed as the person to be notified of its arrival. He was the person with the contacts in Venezuela, and he arranged for the retrieval of the container. Cf. Echeverri, 982 F.2d at 678 ("Both constructive possession and guilty knowledge may be inferred from a defendant's dominion and control over an area where narcotics are found."). It

-14-

strains credulity to suggest that he would not have known the container's contents or the plans for distributing them. Gorbea cannot claim to be an innocent third party through whose hands contraband could easily pass unknown. He was the intended recipient of the container, and he exercised control over the container once it landed in Puerto Rico. That the name of the consignee was fabricated and Gorbea seemed to have little beneficial, economic use for the container's legitimate contents only fortifies this conclusion. The jury's inferences are rooted in a plausible reading of the record and their conclusions regarding knowledge, intent, and participation flow logically from these reasonable inferences.[5] Thus, we affirm the district court's denial of Gorbea's motion for judgment of acquittal.

2. Hernández

Hernández argues that his motion for judgment of acquittal should have been granted because the government produced no evidence that he "knew of the existence of the cocaine inside the sealed container" or that he "knowingly participated in or knowingly helped facilitate" the scheme to import and distribute cocaine. Instead, he

---

[5]     Perhaps in a last ditch effort to convince us of the insufficiency of the evidence supporting his convictions, Gorbea casts aspersions on some of the testimony offered at trial and relied upon by the district court in denying his motion for judgment of acquittal. These arguments are to no avail. It is not our role to assess the credibility of trial witnesses or to resolve conflicts in the evidence, instead we must resolve all such issues in favor of the verdict. See Morillo, 158 F.3d at 22.

says the evidence shows only that he was merely present at the scene of the crime.  That is not so.

Hernández's best argument is that he only participated in the transport of the container from Crowley Yard to the J.R. Transport truck yard and that he never opened the container, so he did not know what he was transporting.  Nonetheless, a reasonable jury could infer his knowledge of the contents of the container and his participation in the larger scheme.  The manner in which the container was transported in his company's truck was unusual, suspicious, and evasive, both while he followed the truck in the van and while he was in the truck.  Further, Hernández acted as a look-out might, following the truck in his van and getting into the truck only after it was some distance from Crowley Yard.  Cf. Paradis, 802 F.2d at 564 (citing evidence that the defendant engaged in "countersurveillance techniques" to support the conclusion that she was "an active participant in the cocaine distribution scheme" and "much more than an innocent bystander").  The truck stopped a number of times along its route, taking hours to travel a distance that the district judge estimated should take no more than half an hour.  The truck engaged in evasive measures such as u-turns and driving without headlights.[6]

When the container eventually arrived at the truck yard,

---

[6]    As with much of the evidence in this case, the record provides other possible explanations for these facts.  We must view the evidence in the light most favorable to the government, however.

-16-

other individuals arrived, greetings and congratulations were exchanged, and what may have been a firearm was spotted. Ruiz-Galíndez, Hernández's employee and the driver of the truck, took part in the revelry over the seemingly successful delivery of the cocaine. A celebration of the arrival of plastic cups is hardly plausible. When he was later interrogated by the police, Ruiz-Galíndez was misleading in his account of his activities that day. Cf. United States v. Barbosa, 906 F.2d 1366, 1368 (9th Cir. 1990) (noting that jury could infer guilty knowledge of contents of luggage, in part, from discrepancies in stories defendant told to different federal agents). This inordinate level of attention to the container makes probable Hernández's knowledge of its contents and their value. This is something more than mere innocent presence at the scene of the crime. Cf. Direct Sales Co. v. United States, 319 U.S. 703, 713 (1943) ("The step from knowledge to intent and agreement may be taken. There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern."). This conclusion is bolstered by the fact that the container was taken to the J.R. Transport lot, rather than directly to SATCO. Gorbea was willing to entrust this valuable and illicit cargo to Hernández for more than the time necessary to drive it from Crowley Yard to SATCO.

Earlier events also support the jury's verdict. It is reasonable to conclude there had been at least one prior cocaine

-17-

shipment using the same plastic cup ruse, and Hernández's employees had delivered at least one of the prior shipments of plastic cups. Hernández's trucking company was not generally used by SATCO; it was used only for certain plastic cup shipments. Of great weight is the fact that Gorbea wrote Hernández's name on the back of the fax from Marina Kassert in Venezuela requesting the name of the trucker with whom to make arrangements for a shipment of plastic cups.

Given all these facts, Hernández's knowing participation in the scheme and his knowledge of the container's contents is a reasonable conclusion. Cf. Morillo, 158 F.3d at 24 ("[J]uries may infer a defendant's culpable involvement from the fact that other conspirators continued their criminal activity despite the defendant's arrival in a den of iniquity."); United States v. Cordoba, 104 F.3d 225, 229 (9th Cir. 1997). The government's evidence need not exclude "every reasonable hypothesis of innocence" but need only be sufficient to allow a reasonable factfinder to find guilt beyond a reasonable doubt. Guerrero, 114 F.3d at 343 (internal quotation marks and citation omitted); see Loder, 23 F.3d at 590. The resolution of "conflicting factual statements" and "any concomitant credibility calls" are left to the jury; we affirm where "the jury's decipherment of the record represented a plausible choice among reasonable alternatives, all things considered." Ortiz, 966 F.2d at 713. We affirm the district court's denial of Hernández's motion for judgment

-18-

of acquittal.

B.   <u>Statements Made During Closing Arguments</u>

Gorbea argues that certain statements made by the prosecutor during closing arguments denied him a fair trial.  First, he argues that statements made about the fax from Marina Kassert to Gorbea "misrepresented the record and mislead [sic] the jury."  In particular, Gorbea points to the following statement from the prosecutor:

> Now, ladies and gentlemen, why does a shipper in Venezuela need the name of the trucker in Puerto Rico, to square what?

He argues that this statement and others like it improperly relied on the fax to prove a criminal association between Kassert, Gorbea, and Hernández.  This reliance was improper, Gorbea asserts, because the fax concerned an earlier shipment that was not alleged to be a part of the conspiracy and because Consorcio EFB, not Kassert, was listed on the bill of lading as the shipper of the seized container.

Second, Gorbea points to the following statement by the prosecutor:

> [A]ll of a sudden Mr. Douglas and others because the others to the Grand Jury well known came up with a plan; you have the people in Venezuela who we don't know but we know that they exist because this shipment containing one billion dollars worth of drugs came from Venezuela and you must consider that if that shipment is going to take place the people involved, that shipped, want to know first, want to assure themselves that they can use safe means and deceitful means to get that shipment to Puerto Rico and they want to know that the people that they entrust this shipment to are with them otherwise it wouldn't make any sense.
>     And, of course, we are not charging that these

> defendants were the buyers of that cocaine, no, they were instruments, they were conspirators and at some point in time they got on that little train of bringing the cocaine from Colombia to Puerto Rico for later distribution.
>
> That shipment must have come for [sic] a lot of people because you will remember from the evidence that is before you that the bricks were marked in different ways . . . so that is to identify the shipments and don't be surprised that many people in Colombia pulled their resources together to make this shipment, some contributed maybe 100 kilos, other [sic] 300 kilos, and they made a pool.

Gorbea says that this statement, and in particular the language "others to the Grand Jury well known," "went far beyond any evidence or supportable inferences at trial, allowed the prosecutor to become an unsworn witness, and explicitly lead [sic] the jury to believe that information not presented at trial, which the Grand Jury had already authoritatively decided, supported the prosecutor's conclusion that the telefax related to the seized shipment of cocaine."

Gorbea lodged a contemporaneous objection to the first statement,[7] and so we review de novo the question of whether the comment was improper and review for abuse of discretion the question whether the misconduct, if any, warrants a new trial. See United States v. Lewis, 40 F.3d 1325, 1337-38 (1st Cir. 1994). Prosecutors are free to ask the jury to make reasonable inferences from the evidence submitted

_____

[7] The specificity of this objection is a bit lacking. Cf. United States v. Auch, 187 F.3d 125, 128-29 (1st Cir. 1999). The government, however, does not argue this point and so, for the purposes of appeal, we consider Gorbea to have properly objected to this comment.

-20-

at trial.  This statement was not improper and "simply called on the jury to employ its collective common sense in evaluating the evidence and to draw reasonable inferences therefrom."  United States v. Abreu, 952 F.2d 1458, 1471 (1st Cir. 1992) (internal quotation marks and citation omitted).  Gorbea argues that the prosecutor misled the jury with this comment by suggesting that the document had to do with the seized shipment of cocaine.  The government specifically said that the document was dated February 1997 and that the result of this fax was the first shipment of plastic cups, which arrived in March.  The government certainly asked the jury, in this comment and others, to infer that the defendants reached an agreement regarding the scheme prior to the shipping of the seized cocaine and may have even imported some cocaine prior to the seizure, but there is nothing improper in suggesting that the jury draw such an inference.  It goes directly to the necessary elements of the crimes charged and is based on the evidence admitted at trial.

Gorbea also argues that reliance on the fax was improper because it involved a shipment outside the scope of the charged conspiracy and because it was from Kassert, whereas the seized shipment was shipped by Consorcio EFB.  Gorbea has not challenged the admission of the fax, however, and the government was free to rely on admitted evidence to explain "the background, formation, and development of the illegal relationship" and "to help the jury understand the basis for

-21-

the co-conspirators' relationship of mutual trust." United States v.
Escobar-De Jesus, 187 F.3d 148, 169 (1st Cir. 1999) (upholding the
admission of evidence of bad acts outside the scope of the conspiracy
for this purpose).

As for the claim that Kassert was not the shipper of the
seized container, the government's comment was not misleading.
Further, while the parties have not pointed us to any evidence in the
record that directly links Kassert with Consorcio EFB, there is
testimony that Kassert was the source for the plastic cup shipments and
evidence that at least three of the previous plastic cup shipments
(although not the March shipment) came from Consorcio EFB. There is
certainly evidence from which the jury could infer that Kassert was
linked in some way to the shipments from Consorcio EFB.[8] And it was not
improper for the government to ask the jury to make such an inference.

As to the second statement, Gorbea's protest is really
targeted at two different statements contained in the paragraphs quoted
above. His first complaint is with the reference to "others to the
Grand Jury well known." His second complaint is about the suggestion
that drug suppliers pooled their resources to create the seized
shipment. We evaluate these comments separately, as Gorbea objected to

---

[8]     It was suggested in oral argument that Kassert might have
been a broker of sorts for the Venezuelan shipper.

the second statement, but not to the first.[9]

Where a defendant fails to object in a specific and timely manner to allegedly improper prosecutorial statements, our review is only for plain error. See Lewis, 40 F.3d at 1338-39; Arrieta-Agressot v. United States, 3 F.3d 525, 528 (1st Cir. 1993). Thus, we review the comment regarding "others to the Grand Jury well known" under the plain error standard. Under this standard, reversal is appropriate only if the improper argument "so poisoned the well that the trial's outcome was likely affected." Arrieta-Agressot, 3 F.3d at 528 (internal quotation marks and citation omitted).

Gorbea says that this statement was "part of a carefully crafted and impermissible trial strategy aimed at misleading the jury into impermissibly inferring the government possessed additional evidence supporting their theory that Marina Kassert was involved in a conspiracy because 'others to the Grand Jury well known' had made a pool to arrange for the drug shipment." Much more plausible is the government's explanation that the reference was "either an involuntary lapsus, by the prosecutor or an error by the court reporter who took the phrase . . . in lieu of 'others to the Grand Jury unknown' as is

---

[9]    Gorbea suggests that the objection he made at the very end of the paragraphs quoted above should be sufficient to avoid plain error review of the "others to the Grand Jury well known" comment. This was only a general objection, however, and it was far enough removed from the "others to the Grand Jury well known" comment so as not to put the district court on notice. See Auch, 187 F.3d at 128-29.

charged in the indictment" (emphasis added). After all, the reference was directly followed by the statement, "you have the people in Venezuela who we don't know but we know that they exist because this shipment containing one billion dollars worth of drugs came from Venezuela." This isolated and most likely non-deliberate statement could not have caused a miscarriage of justice. See United States v. Santana-Camacho, 833 F.2d 371, 373 (1st Cir. 1987) ("The plain-error exception to the contemporaneous objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.") (internal quotation marks and citation omitted); United States v. Levy-Cordero, 67 F.3d 1002, 1008-09 (1st Cir. 1995).

As to the portion of the statement that suggests that drug suppliers pooled their resources to create the cocaine shipment, we review de novo the question whether the comment was improper and review for abuse of discretion the question whether a new trial is warranted. See Lewis, 40 F.3d at 1337-38. This statement was not improper. There was evidence at trial that the bricks of cocaine found in the container were marked and packaged in different ways. Some of the bricks had Walt Disney characters pasted on the outside, some were wrapped in plastic, some in styrofoam, and some contained a reddish gel. A Customs agent testified that in his experience these different methods of packaging were used to identify the supplier and, in some cases, to

-24-

identify the proper recipient.  Contrary to Gorbea's suggestion, the prosecutor's statement was not outside of the scope of the evidence presented at trial and did not allow the prosecutor to become an unsworn witness.  It was entirely proper.

C.  Admission of Testimony Regarding Street Value of Cocaine

Hernández argues that it was an abuse of discretion for the trial court to admit the testimony of Drug Enforcement Agency Special Agent James Casey.  Casey testified that the street value of the cocaine seized from the container was close to a billion dollars in Puerto Rico at the time.  Hernández objected to this testimony at trial, claiming that it was irrelevant and that its probative value was outweighed by the risk of unfair prejudice under Federal Rule of Evidence 403.  The district court overruled these objections and allowed the testimony, finding that the street value of the cocaine was relevant to the knowledge of the defendants and that any prejudicial effect was outweighed by the evidence's probative value.  The district court said, "it certainly would be proper for the jury to infer that such a shipment of such a worth certainly would not be left to be handled by persons who did not know what was in there."

On appeal, Hernández argues that the trial court should have excluded this evidence because of its risk of unfair prejudice.  He says that the jury already had ample evidence from which to draw inferences regarding knowledge and intent to distribute, in the form of

photographs of the load and testimony regarding the amount of cocaine found in the container.

The district court's Rule 403 balancing stands unless it is an abuse of discretion.  See United States v. Rosario-Peralta, 199 F.3d 552, 561 (1st Cir. 1999).  The street value of cocaine is relevant to the issues of knowledge, cf. Cordoba, 104 F.3d at 229, and intent to distribute, see United States v. Rivera-Santiago, 107 F.3d 960, 969 (1st Cir. 1997); United States v. Rivera, 68 F.3d 5, 8 (1st Cir. 1995).  It is true that "such evidence could conceivably become substantially more prejudicial than probative if the figure is large enough and if other evidence to prove intent to distribute is available."  Rosario-Peralta, 199 F.3d at 565.  But in this case, both defendants professed ignorance of the contents of the container.  They were both, they said, simply legitimate businessmen.  The evidence of street value of the contraband in the shipment was meant to counter that contention.  There is no basis to second-guess the trial court's view.

D.  Hernández's Sentence

Hernández argues that it was error to hold him responsible for the 3,017 kilograms of cocaine alleged in the charges.  Given Hernández's criminal history category, this quantity resulted in a sentencing range of 235 to 293 months under the Sentencing Guidelines.  See U.S.S.G. § 2D1.1.  The district court sentenced him to concurrent 293-month terms.  Hernández argues that this sentence was excessive and

that a minimum sentence of 120 months should have been given.

In drug cases, sentences are largely driven by the quantity of the drugs involved.  See United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993).  "[I]n the context of jointly undertaken criminal activity, such as a conspiracy, a defendant is not automatically saddled with the full weight of the conspiracy's wrongdoing; rather, a defendant is responsible for drugs he personally handled or anticipated handling, and, under the relevant conduct rubric, for drugs involved in additional acts that were reasonably foreseeable by him and were committed in furtherance of the conspiracy."  Id. at 1197.

Hernández argues that the 3,017 kilograms of cocaine should not be attributed to him because there was no evidence that he had any knowledge of the amount of drugs in the container.  He says that most of the district court's findings to the contrary were not supported by the evidence introduced at trial.[10]  We review a sentencing court's findings regarding the quantity of drugs involved, the role played by the defendant, and the quantity reasonably foreseeable to the defendant for clear error.  See United States v. De La Cruz, 996 F.2d 1307, 1314 (1st Cir. 1993); see also United States v. Graciani, 61 F.3d 70, 74

---

[10]    Hernández asserts that the district court acknowledged that there was no evidence that he knew the quantity of drugs involved. This statement is a bit misleading.  The district court stated that while there was no "direct evidence" of knowledge, the evidence suggested that Hernández "must have known that there was a large quantity of drugs coming in."

(1st Cir. 1995).

The issue here is straightforward: is the district court's finding that Hernández knew or could have reasonably foreseen the quantity of drugs contained in the seized container, which he was directly involved in transporting, clearly erroneous? It was not.

All of the evidence and inferences discussed in connection with Hernández's challenge to the sufficiency of the evidence apply with equal force here. The district court's conclusions were properly rooted in the evidence and its inferences founded in logical reasoning. "A defendant who conspires to transport for distribution a large quantity of drugs, but happens not to know the precise amount, pretty much takes his chances that the amount actually involved will be quite large." De La Cruz, 996 F.2d at 1314.

Even if the district court's attribution of all 3,017 kilograms to Hernández could be faulted, we note that any error would be harmless. See Sepulveda, 15 F.3d at 1199-1200. The base offense level assigned to Hernández applies to crimes involving 150 kilograms or more of cocaine. See U.S.S.G. § 2D1.1. Thus, as long as some amount equal to or exceeding 150 kilograms can be attributed to Hernández, the same sentencing range applies.

**IV.**

After carefully considering each of the defendants' challenges, we affirm their convictions and Hernández's sentence.

-28-